Case No. 15-1720, Jerrick Rodriques v. Delta Airlines Inc. Argument not to exceed 15 minutes per side. Ms. Brock, you may proceed for the appellant. Good morning to the court. Morning. If it may please the court, I'm Felicia Duncan Brock, and I represent the plaintiff appellant, Jerrick Rodriques, in this matter. And I would like to reserve five minutes in rebuttal time. All right. Would the court require a recitation of the facts this morning? I'll leave that to you. We're already familiar with the facts, so if you do go into the facts, it should be in relation to your legal argument, I would think. But I'll let you proceed as you prefer. Thank you. Well, I'd like to begin with just basically the simple standard that all of us are pretty familiar with, that in discrimination and retaliation cases, the plaintiffs carry a pretty heavy burden to present facts and evidence in support of their claims. One such element that has to be met in order to carry that heavy burden is that they have to be able to show that similarly situated people outside of their protected class were treated differently. So if you haven't already noted, I went straight to the comparable issue because I think that it's probably one of the stronger issues. That's absent direct evidence of illegal discrimination, right? Absolutely. And here you concede you have no direct evidence of racial discrimination? I do. So you rely on a circumstantial case. I do. So we have to look at comparables. Absolutely. And basically, if we are unable to present those comparables, of course the case would and should be dismissed on summary judgment because the plaintiff is unable to make out their prima facie case elements. However, the defendant in a case, when they bring that motion for summary judgment and they claim things like there are no comparables or they chose the incorrect comparables, they have to do that through the use of clear and convincing evidence. And I bring that up because it's something that in the case law I often don't really see a lot of reference to in regard to the defendants in a case. When you go back, the defendants have a burden of clear and convincing evidence of who is not a comparable? Clear and convincing evidence that there is no genuine issue of material fact that should proceed to a jury. I thought you said that as to whether other ploys are similarly situated, it's the defendant's burden to disprove it. No, it's your burden to establish it, right? Absolutely, and all they do have to do is articulate, and then the burden comes back to me to be able to be persuasive and to establish it. And so certainly that clear and convincing evidence standard is not an easy burden to always meet, even for a defendant. And, in fact, summary judgment is not something that should just lightly be awarded to a defendant and that it does in the plaintiff's case in its entirety. And so in that vein, I submit to this court that there are multiple issues of material fact that do require this case to go forward to a jury and denial of the defendant's motion for summary judgment in this matter. First is the big issue with the comparables. Plaintiffs have identified their comparables, his comparables, as being Mr. Conover and Mr. Culpepper. And certainly had he not identified these comparables, the defendant, I believe, would be happily arguing that we just never identified any comparables. But that's not their argument here, which I find interesting. What they are arguing instead is that we chose the wrong comparables. But I believe that it is for the plaintiff to determine who their comparables are and it is for the court to make an initial determination as to whether those comparables meet all of the standards under the law to actually act as comparables. And in here we say that we have met all of those requirements. One such requirement being that they are under the same management chain, which has not been challenged in this case at all. Another requirement is that they have relevant similarity. We argue here that certainly these three gentlemen have relevant similarity in their actions. First and foremost, that all three were accused of committing multiple instances of time card fraud. And that becomes the grave men of this case, if you ask me. They argue that the other employees, their violations occurred on the same day as opposed to your client's violations, which occurred, I think, over a 30-day period. And I think there were four different days or something. I mean, they argue, well, they're not similarly situated because you have one-day violations by these two people while you have multiple-day violations by your client. I mean, how do you respond to that? I respond to that by saying that because Delta does not have any policies, and intentionally so, every case has to be looked at at a case-by-case basis. And in this instance, there is no policy that says the instances have to occur on separate days. What they say to us, at least in argument, no facts to support it, but in argument is that you have to, if you have multiple instances, then you're going to be terminated. That's what they say in argument. Now, what I would say in response to that is I am strongly believing that this is an issue of fact for the jury merely because Delta itself distinguished these instances as being multiple instances in how they dealt with them, even though they occurred on the same day. The issue of whether other employees are similarly situated is a jury issue as opposed to an issue of law? That's your position? It can be. It is a jury issue if there becomes a genuine issue of material fact. What's the genuine issue of material fact? I think it's a given that the other employees had two violations in one day while your client allegedly had multiple violations over several days. What's the factual dispute that a trier of fact would have to resolve as to that? The factual dispute is in Delta's documentation itself because in the disciplines for Mr. Conover and Mr. Culpepper, they only address one instance of time card fraud, and they intentionally hid the other instance, which is a red flag to me that there were multiple instances. The management chain involved here put it on paper that these individuals were being investigated for time card fraud involving being removed and requesting to be removed from the RTS system. Nothing more, nothing less. And they were disciplined for that. One was given a last chance agreement. The other was actually demoted out of his pseudo-supervisory position. Then they went behind and off the books and dealt with the second violation. They didn't inform human resources of that second violation. They didn't put it in writing anywhere. And but for deposing the witnesses themselves, I wouldn't have even known about the second violation. That's just how well they hid the second instance of time card fraud. And they actually docked them pay for that second instance, which isn't mentioned in any of the documents that you're going to see before you, provided by either the plaintiff appellant or the appellee. It was just that well hidden that these gentlemen committed a second instance. And the second instance was separate and distinct from being removed from the RTS system. Mr. Conover, yes, he asked to be removed because he wasn't feeling well. He, according to him, went to a closet and slept for his entire shift. He testified that he intended to stay punched in, and he did. He intended to steal the time from the company, and he was stealing the time from the company. But what also came out after I struggled and got some additional documents is that Mr. Conover left the building. He was gone, off-site, while punched in after asking to be removed from the RTS system. So he says to go get some medicine and some gas, and then he came back. But when I deposed him, he testified that he never left the building, that he was there the entire time, and that I would not see two swipes in and out of that parking garage. But once I got his actual written statement from the day, I see on the written statement that he had left the building and management knew that. And that's how come they docked him the entire day, because he was sleeping in a closet, not only because he asked to be removed from that system, and he left the building. And Judge Griffin, isn't that in fact what they're accusing Mr. Rodriguez of doing? They said Mr. Rodriguez came in, he punched in, he went and got back in his car, and went and parked his car, and he could not have been at work and parking his car at the same time. Talk to us a minute about the other two. What about Mr. Lilla and Mr. Baydoon? Is that the way you pronounce it? Absolutely. When you take a look at Mr. Lilla and Mr. Baydoon, you will find that their situations, although ended in the same result, were still quite different from Mr. Rodriguez. And I challenge whether they, number one, are comparables, or whether their situation rises to a level of discounting what went on with Mr. Culpepper and Mr. Conover. First of all, Mr. Lilla, who was the Caucasian male, he, according to Ms. Mann's testimony, the incident that leads to the investigation happens, and then they start the investigation. Mr. Lilla's incident happened on December 16th. He had a recommendation for termination five days later. This white male, his investigation happened extremely quickly. They got in and got out, and it was after a month after what happened to Mr. Rodriguez. And it was, I'm not comfortable with the timing of everything that happened with Mr. Lilla. And, in fact, they handled Mr. Lilla different altogether. They actually didn't go back just 30 days. They went back 60 to make a case so that they could terminate this white male. And I do believe at this point it was to sure up that we treat white people the same way when they had never done it before this. They had never terminated a white male for this prior to Mr. Rodriguez being terminated. The same with Mr. Lilla, I mean, with Mr. Badu. Were there any instances of white males prior to this time frame who were not terminated who had done the same thing? No, they never had investigated one prior to this. However- In other words, they weren't, your contention is they weren't disciplining them at all prior to this for these kinds of infractions. And it shows through in what happened with Mr. Conover and Mr. Culpepper because they did that very same thing, which was their motif. Don't forget that this was a hostile work environment. We have that from testimony of the very same witness that they're relying on who said the white people look out for the white people. The black people look out for the black people and the Arabs look out for the Arabs. This was a racially hostile environment. Wait a minute. You mean these are just rumors or offhand comments of various people? There's no adjudication of anything to that effect, is there? Well, no, there isn't. But I don't consider them out comments that shouldn't be considered because they work there every day. They see it every day. Now, this witness in particular is Mr. Culpepper, who is the one who disappeared for over half of his shift. He said that he was in the lunchroom. He said that people saw him. They believe that. And they tell this court, you need to believe it, but you don't need to believe what he says about the hostile work environment. It's a credibility issue. Either he's a credible witness or he's not. Either he was in the lunchroom and people saw him for four or five hours that he didn't do any work or they didn't. Either the environment, at least based on what he saw on a day-to-day basis, was hostile racially or it wasn't. But then on top of that, their own documents spell it out. When I look at the fact that Mr. Culpepper was told, we're going to take care of your discipline. Don't worry about it. The heat is on right now. Soon as we get the heat off, which the heat was Mr. Rodriguez's multiple complaints, we're going to take care of it. And an entire year later, they did just that. They reduced this man. He stole time. He altered the system to help someone else steal time. And they changed his discipline from a written to a coaching. Elsa, your red light has been on for a while. I'm sorry. Unless you'd like to take some time from your rebuttal to use it now. No, I don't. I need my rebuttal time, Judge Clay. But thank you, gentlemen, anyway. Thank you. Good morning. May it please the Court. Sharon Rae Gross on behalf of the Applee Delta Airlines. Delta's here this morning to ask the Court to affirm the District Court's granting of Delta's motion for summary disposition, dismissing Mr. Rodriguez's case. First and foremost, because Mr. Rodriguez has not demonstrated that there is a material question of fact about whether or not his employment was terminated under circumstances that give rise to an inference of discrimination, because he has not, in fact, demonstrated that there are comparable employees who were treated more favorably than he was. So going straight to the comparables, this Court has held that to qualify as similarly situated in a disciplinary context means that the plaintiff and the alleged comparators must have the same supervisor, must have dealt with the same circumstances, and not have any differentiating or mitigating conduct that the employer considered in the context of disciplining them. In this case, yes, absolutely, Mr. Culpepper and Mr. Conover committed time-related violations, but as Judge Griffin, you pointed out, they were all on the same day. Now, is it possible to go back now and look at the records and question whether or not if the HR person who has been pointed out did not realize that Mr. Conover had left the premises? Had she known that, would it be possible that those violations would have been dealt with differently? Perhaps, but that's merely questioning the employer's judgment in terms of how it dealt with these circumstances. It doesn't give rise to a question, in fact, about whether or not any of this decision-making was racially motivated. That is dispelled, in fact, by the fact that Mr. Lilla... Did you acknowledge that he had left the premises and that he misrepresented the issue of whether he had left the premises? Does management agree or acknowledge that? Yes, he testified that he had not left the premises, but when the discovery documentation was produced, it did indicate that he had actually admitted at the time that he left the premises, but he neglected to say that in his deposition. But there is clear testimony... Is he still employed by the company? He is. Now, you've got an employee who left the premises, said he didn't, acknowledged that he made misrepresentations in a legal proceeding at that, and you've continued to permit him to maintain his employment? He acknowledged at the time in a written statement that, in fact, he had gone to his car. What he didn't do was, when his deposition was taken, acknowledge that he'd done that. So he lied in his deposition, and you know that, and you've continued to permit him to be employed. Not you, but management. Well, the fact that he neglected to say in his deposition two and a half years later that he'd left the premises isn't a basis upon which the company can go back and take action against him for a violation that is already deemed to be something that was subject to a final corrective action. Well, you could take action about his misrepresentation when you find out about the misrepresentation. But he didn't misrepresent it at the time, Your Honor. At the time, the judgment of the company was that this was the appropriate disciplinary action. I mean, is it possible to parse his activities all through the day and say, no, this is one or two or three violations? Yes, it's possible to do that. But there's no indication that it wasn't done because of his race. There's also, although all of these people report to the same general manager, there are two different sets of supervisors involved here. The supervisors that handled Mr. Rodriguez's situation and interviewed him and made an assessment about his credibility with respect to his discrepancies and his time swipes are not the same supervisors that dealt with Culpepper and Conover. And there's no indication that Mr. Lilla or Mr. Bedouin were dealt with any way differently than Mr. Rodriguez was. The suggestion seems to be made that they were deliberately terminated in order to somehow cover up the fact that Mr. Rodriguez was being terminated. There's absolutely no evidence in the record to support that. Is Mr. Bedouin Caucasian or Asian? He's actually listed in the company's records as white, but he is, I believe, Middle Eastern. I think he regards himself as Asian. But neither one of them are African American. The other thing that's been offered as a suggestion of pretext in this case is some kind of suggestion that there's a racially hostile atmosphere here based on the statistics that have been derived somehow from defendants' production. The information that was produced, the underlying information from which the statistics have been derived by Mr. Rodriguez's counsel, actually shows that of the people whose swipes were pulled, 60 of them were African American, 20 of them were white. What's not clear is how it is that that data is somehow being used to suggest that you are more likely to have your swipes pulled if you are African American because the underlying representation of African Americans in the population was not requested nor produced. More importantly, the raw data from which those statistics are pulled is in fact in the record, and that data shows that of the 36 African American employees who had their swipes pulled, five were terminated, the rest received either a lesser disciplinary action or no disciplinary action at all. Of the 20 white employees whose swipes were pulled in the same two-year period, three were terminated, everyone else received either a lesser disciplinary action or no disciplinary action at all. Okay, but of those employees whose swipes were some disciplinary action was taken, how many of those did you ascertain had actually committed an infraction? In other words, if you look at 36 and five incurred discipline, how many was it that only five were discovered to have committed an infraction or were they thin in action taken against five? How do you account for that? The five were engaged in activity at a level that was deemed by the same company decision makers to warrant termination. Of the 20 white employees, three engaged in a level of time card multiple swipe activity that warranted termination. That pattern is five out of 36 is roughly 14%, three out of 20 is 15%. So out of the 36 African Americans who had their swipes pulled, 14% were terminated. Out of the 20 non-African Americans, white employees who had their swipes pulled, 15% were terminated. That data does not suggest racially mated... All that tells us is how many employees action was taken against. That doesn't really tell us how many committed an infraction and what severity of the infraction. I agree, Your Honor, and I honestly... Delta's argument in this case is that there has not been a sufficient discovery of or expert analysis of any sort of statistical evidence to warrant trying to infer pretext based upon the statistics. I mean, the counsel has alleged in the brief that the statistics demonstrate a racially hostile atmosphere because they suggest a higher probability of either having your time card swiped or getting terminated for it if you are African American. But there's nothing about this raw data that demonstrates that. It's also been suggested that the lack of an HR policy is somehow indicative of pretext or a triable question of fact for the jury. There's ample testimony in the record by HR individuals and by supervisors that Delta takes the totality of the circumstances into consideration when it decides whether or not to terminate people for these kinds of offense. It's absolutely accurate. It does not have a policy that says if you do this, you are terminated. If you do that, you are terminated. That's why they pull time card swipes. That's why they've pulled time card swipes for multiple people, not just Mr. Rodriguez. They, in fact, pulled the time card swipes for Mr. Culpepper and Mr. Conover. Neither of them had any other instances in the prior 30 days, which also distinguishes them from Mr. Rodriguez. So how many were terminated on the same day that Mr. Rodriguez was terminated? Two other people were terminated on the same day, Mr. Lilla and Mr. Bedwin. And your position is that they are the most directly comparable to Mr. Rodriguez? Our position is that they are the most directly comparable. It's also our position, based on the Douglas v. Eaton Corporation case, that the fact that there are non-African Americans being terminated in the same transaction as Mr. Rodriguez is being terminated dispels the notion that you can assume from anyone, any data that's provided here about the races of the people being terminated, that there's a circumstantial case of race discrimination. The presence of those individuals, of similarly situated employees outside the protected class who were treated the same as the plaintiff, dispels the notion of pretext. Was that the basis that the district court granted summary judgment? The district court, I believe, decided that they were not comparable based on my reading of the district court's oral argument transcript. But our position today would be even if the court has some concern about whether or not Mr. Rodriguez has made his prima facie case of comparability with Mr. Culpepper and Mr. Conover, the presence of Mr. Bedwin and Mr. Lilla dispels the notion that there is a pretext here in Delta's articulated reason for terminating Mr. Rodriguez. I thought my reading of the district court's, and he did the ruling orally, didn't he? Yes, he did. But my feel from reading it was that, well, if it had just been Mr. Culpepper and Mr. Conover, it might have been a jury issue. But because of Lilla and Bedwin, it's not. That's correct, Judge Gilman. I believe that was the district court. I mean, the district court absolutely indicated that it would be a much closer case if the only people involved in the analysis here were Mr. Conover, Mr. Culpepper, and Mr. Rodriguez. But the presence of Mr. Lilla and Mr. Bedwin negated the notion that there was any race-based decision-making going on here. With respect to the suggestion that there's a hostile work environment, racially tainted work environment, the testimony that's being relied on from that, ironically, is from Mr. Culpepper. And it was made in the context of promotional opportunities at Delta. And specifically, he said that when it came to positions and people being picked for positions, he felt like the Arab managers picked the Arabs, the black managers picked the black people, and the white managers picked the white people. Mr. Culpepper was not a decision-maker. He's a peer of Mr. Rodriguez, had no involvement in any decisions about his termination. It's his own personal opinion, and it's not probative enough to create a triable question of fact for a jury in terms of whether or not there's pretext here based on a racially hostile environment. Problems with Delta's time clocks have also been offered as evidence of pretext. The fact that Delta acknowledges that it has problems with its time clocks means that it's a pretextual reason that Mr. Rodriguez was terminated. In fact, Mr. Rodriguez did not offer problems with the time clocks as his explanation for his conduct, and there's no indication that anybody else has been excused from their conduct based upon problems with the time clocks. Moreover, it ignores the fact that two of Mr. Rodriguez's offenses were based on handwritten slips and had nothing to do with time clocks. There's also a suggestion made that shortcomings in Delta's investigation indicates that there's evidence of pretext. Specifically, a lot of attention is being drawn to the fact that the Delta HR representative, Ms. Franz, was unaware that Mr. Conover had left the building. Well, again, that is simply going back and questioning whether or not an adequate investigation was done. And as this court said in the Hutton case, even where the plaintiff can establish that the employer's actions were premised on some sort of incomplete set of facts or an incomplete investigation, they do not necessarily succeed in establishing pretext. The investigation in this case was as complete as it could have been. It is always possible to go back and question the employer's judgment making, but there's no evidence that race played a factor into that judgment. And finally, with respect to Mr. Rodriguez's retaliation claim, there's no indication that anybody who had anything to do with the recommendation to terminate Mr. Rodriguez's employment had knowledge of the fact that he made an anonymous call to Delta's hotline on December 17th to allege that he was being discriminated against. Do you admit he made the call on December 17th? Delta actually disputes that it was made on December 17th. The only record Delta has of a call is January 3rd, but even if we take the facts as alleged by Mr. Rodriguez and assume that he made it. Did Delta have a record of such a call? The call number that Mr. Rodriguez was given matches a call that came in in Delta's system on January 3rd. So it is a disputed question of fact about whether or not... Just because he says he made a call, if the evidence shows conclusively to the contrary, we don't have to accept his testimony. I mean, if he had made a call, would it have been recorded by Delta? A call was, in fact, recorded. Yeah. If he made a call on the 17th, would it have been recorded by Delta? Yes or no? Yes, it should have been. Should have been? I mean, are there gaps? I mean, it appears to me that he did not make a call on the 17th because there should have been a record of it. And the fact that he says he did, I don't think necessarily has to be accepted. That's all. I don't disagree, but I would suggest to the Court that even if you do accept it, it doesn't matter. Because the decision-makers didn't know about it. Because the decision-makers didn't know about it and because there's a clear record that the recommendation to terminate his employment was drafted on the 15th of December, two days before he made the call. So the decision was made before the call. Correct. By decision-makers that didn't know about it. Okay. So in sum, Delta suggests that Mr. Rodriguez's claims were appropriately dismissed and requests that this Court affirm the District Court's decision. Thank you. Thank you. If I might begin by clarifying the record about Mr. Rodriguez's instances of time card fraud, there were four or alleged instances. There were four on his particular memo and recommendation for termination. However, two of those were on written PACE forms, and they should not be included in your analysis. And the reason is because November 6th was Election Day, and he had permission on that particular day to be late. He had already contacted his PL, his direct supervisor, and informed them that he was in line voting. We had very long voting lines on that day. The November 8th or 10th, because the date flip-flopped throughout the litigation, the timing was accurate. The time that he signed in and the time that he swiped in was three, four minutes apart, and we have other employees, including Mr. Culpepper, who make it from the parking garage to inside of the building within that time frame. So those two dates, in essence, are not to be, I don't think, considered in this analysis. That leaves at most two instances, at most, and we dispute one of the other instances and therefore puts him directly in line with the two instances that Mr. Conover and Mr. Culpepper had. I just want to address for 60 seconds the Douglas v. Eaton court case that was brought up here today, indicating that if individuals who are outside of the protected class also were treated that way, then there cannot be pretext established. That case is an unpublished Sixth Circuit Court of Appeals opinion. As this court is well aware, it is only to be cited and used in limited circumstances per the rules. This court is also aware that although it could be persuasive, it is not binding. But more importantly, the court can and should look to this case as guidance, the discussion as to the thought processes of the court. But when you look at the Douglas opinion, this court didn't have a thought process as to this particular statement. They didn't discuss why they felt that way, how they reached this conclusion. They merely made a blanket statement, which ultimately ended up being dicta because it was not dispositive of why the plaintiff's case was actually dismissed. In fact, they found that the plaintiff did not produce evidence of any comparables at all. Not that just people outside of their protected class was treated the same. That ended up not being dispositive as of the ruling. And in fact, they cited to a Seventh Circuit opinion that has never been cited in its own circuit for standing for that proposition. Sixth Circuit does not have that case law as binding in any way. Mr. Beydoun and Mr. Leela, just briefly in the last two minutes. Mr. Leela, let's go back to Mr. Rodriguez. His incident happened on November 17th. Ms. Brock, you're almost out of time. If we agreed with you that you established a prima facie case by the comparables, tell me how you rebutted their legitimate, nondiscriminatory reason for discharge. This is how. Because according to the EEOC v. Guardian case, in the event that the prima facie case is established and the issue of material fact that's involved in that fourth element is the same as in the pretext argument, then that has to go to a jury. It's for a jury to decide at that point. You're saying if you establish a prima facie case, you automatically go to the jury? No, I don't say that. Whether you establish pretext? No, I don't say that. What I say is if the reasoning is the same. The articulated reason why they say I don't make out a prima facie case, which is that they terminate it based on the number of instances, is the same reason they offered in the pretext argument. And under the Guardian case, when the reasons are the same, the issue of fact, that's for a jury to determine. That is for a jury to determine. And just in my last 50 seconds, I would just like to remind this court, and I know you know it so well, that the summary judgment standard is that there's no material fact for which a jury could find otherwise. Genuine issue. Genuine issue. Genuine. Genuine, and it is. And I believe that the comparable certainly under Michigan case law is a genuine issue. If there's an issue with comparables, that if the jury could have decided differently, it is taken out of the hands of that judge. Yes, as a matter of law, he or she can make that decision. But if the jury could have decided differently, it is taken out of that judge's hands. And here, the plaintiff appellant has produced enough documented evidence to show that there is an issue, a genuine issue of material fact as to whether Conover and Culpepper had multiple instances or not, and whether that was the true reason for the actual termination decision. Thank you, gentlemen. All right, thank you, and the case is submitted. When the table is clear, you can call the next case. Case No. 15-3551, Siding and Inflation Co. v. Alco Vending, Inc. Argument not to exceed 15 minutes per side. Mr. Bock, you may proceed for the appellant. Good morning, Your Honors. May it please the Court, my name is Phillip Bock. I'm here on behalf of the plaintiff, Siding and Inflation Company, and I'd like to reserve five minutes for rebuttal, if I could. All right.